UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

        - against -

VERNON GENE NEWTON,

        Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CR-307 (PKC)

PAMELA K. CHEN, United States District Judge:

Defendant Vernon Gene Newton is charged in a two-count indictment with importation of cocaine in violation of Title 21, United States Code, Section 952(a), 960(a)(1), and 960(b)(2)(B)(ii), and with possession of cocaine with intent to distribute in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)(ii)(II).  These charges arise out of the stop, search, and seizure of Defendant and his luggage at John F. Kennedy Airport or "JFK" on February 16, 2020.  For the reasons below, Defendant's motion to suppress the evidence seized during the search of his luggage and to suppress his statements to law enforcement officers is denied in its entirety.

## BACKGROUND

By way of general background, Defendant arrived at JFK Terminal 4 in the early morning hours of February 16, 2020 on a commercial flight that originated in Sao Paulo, Brazil.  (Tr.[1] 38:18–39:18.)  After disembarking from the plane, Defendant passed through inspection and customs, picked up his luggage, and was proceeding to re-check his bags with Delta airlines for a connecting flight to Atlanta, when he was stopped by three plainclothes Customs and Border Patrol or "CBP" officers.  (Dkt. 24-1 (Newton Declaration), ¶¶ 3–7; Tr. 12:12–14:16.)  Supervisory CBP

---

[1] "Tr." references the transcript from the August 9, 2021 evidentiary hearing.

Officer Frank Raio asked Defendant for his name and passport, and asked Defendant if he would come back inside the federal inspection area. (Tr. 14:17–19.) At the time, Defendant had three pieces of luggage with him, including a purple hard-sided suitcase and a briefcase. (Tr. 14:11–16.) Defendant agreed to go with Officer Raio, and the two other CBP Officers, Officer Karen Baldwin and Officer Fatima Bunch. (Tr. 12:12–19, 14:17–23, 37:4–6.) Officer Raio was directed by his deputy chief to stop Defendant and search his bags because Defendant matched certain criteria for an ongoing operation called Operation Cocoon. (Tr. 43:8–44:8.)

Defendant was led to a private search room where Officer Raio asked him several travel-related questions and another CBP Officer, Officer Alex Lopez, searched his bags and asked a few questions about their contents. (Tr. 15:3–17:6.) Consistent with CBP protocol, Defendant was not provided with *Miranda* warnings at that time. (Tr. 19:2–6.) A white powdery substance was discovered in the purple suitcase. (Tr. 22:21–23, 33:23–34:6.) A drug testing machine was then brought into the search room and used to test the substance, yielding a positive result for cocaine. (Tr. 22:21–23:7, 33:23–34:6.) The CBP officers then began processing the narcotics and contacted Homeland Security Investigations or "HSI" about the seizure of narcotics. (Tr. 23:8–11, 57:21–22.) A total of 1.3 kilos of cocaine was found in the purple suitcase. (Tr. 55:8–10.) Defendant was placed in handcuffs and arrested for the importation of narcotics into the United States. (Tr. 23:8–16, 57:9–10.) Officer Raio did not ask Defendant any further questions once he was handcuffed (Tr. 64:3–5), however, Defendant continued to make statements, including that he was given the bag and did not know there were any drugs in it (Tr. 23:17–24:7).

HSI Special Agent Ryan Shipley arrived at JFK Terminal 4 at approximately 9:30 a.m. in response to a duty call about two possible narcotics seizures, including the seizure involving

Defendant.[2]  (Tr. 58:9–10, 70:14–71:9, 107:3–8.)  Defendant was transferred from the private search room to HSI's office, which was located on a different floor.  (Tr. 77:4–20.)  Just before 11:30 a.m., Agent Shipley provided Defendant with *Miranda* warnings, and Defendant signed a "Statement of Rights" form consenting to waive his rights to the advice of counsel and to remain silent.  (GX 2 (Newton Statement of Rights); Tr. 79:10–80:4.)  Agent Shipley proceeded to interview Defendant in the presence of HSI Special Agent Mann, who was there to assist.  (Tr. 72:12–21, 77:21–78:1, 80:18–20.)  Defendant, *inter alia*, denied knowing that the suitcase contained narcotics and explained that he had received the suitcase from someone he met during a business meeting in Brazil.  (*See, e.g.*, Dkt. 32-2 at 18:10–20:00 (video recording of HSI interview), 21:22–21:57 (audio recording of HSI interview)).  During the interview, Agent Shipley asked Defendant for consent to search Defendant's two iPhones, which Defendant provided in writing, along with his passcode.  (GX 3 (Newton Consent to Search form); Tr. 80:21–81:15, 82:6–12.)  Agent Shipley subsequently obtained a warrant to search Defendant's iPad.  (Tr. 82:3–5.)

Pending before the Court is Defendant's motion to suppress.  Defendant moves to suppress his pre-*Miranda* statements made to CBP based on the argument that CBP officers lacked reasonable suspicion or probable cause to justify stopping and searching Defendant and his luggage.  Defendant also moves to suppress his post-*Miranda* statements made to HSI based on the argument that these statements were elicited through a deliberate two-step interrogation procedure found improper in *Missouri v. Seibert*, 542 U.S. 600 (2004).  Finally, Defendant moves to suppress all physical evidence, namely his two iPhones and iPad, that were obtained by law

---

[2] Agent Shipley testified that during the duty call he was not informed that Defendant and the other individual had been stopped pursuant to Operation Cocoon, and that it was his understanding from the duty call that the seizures were "completely separate incidents."  (Tr. 107:9–108:4.)  Agent Shipley did not learn about Operation Cocoon until "after the fact, following this case."  (Tr. 106:12–15.)

3

enforcement during the allegedly unconstitutional search and seizure. The Court heard oral argument by video on May 12, 2021, and held an in-person evidentiary hearing on August 9, 2021, during which government witnesses CBP Officer Raio and HSI Special Agent Shipley offered testimony. For the reasons that follow, Defendant's motion to suppress is denied in its entirety.

## DISCUSSION

### I. CBP Conducted a Routine Border Search of Defendant

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (quoting U.S. Const. amend. IV). Warrantless searches are *per se* unreasonable with few exceptions—one exception is a routine search at the international border. *See id.* This is because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004). "[A]irports such as JFK are functionally equivalent to international borders, and '[s]ince the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, *without probable cause or a warrant*, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Singh*, No. 12-CR-121 (DLI), 2012 WL 2501032, at *3 (E.D.N.Y. June 27, 2012) (emphasis added) (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985)); *Irving*, 452 F.3d at 123 ("An airport is considered the functional equivalent of a border and [] a search there may fit within the border search exception."). Likewise, "[i]t is well established that the government has broad powers to conduct searches at the border even where, . . . there is *no reasonable suspicion* that the prospective entrant has committed a crime." *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) (emphasis added) (collecting cases). "Accordingly, a suspicionless search at the border is permissible under the Fourth Amendment so long as it is

4

considered to be 'routine.'" *Id.* at 98. Routine searches are those that "do not substantially infringe on a traveler's privacy rights," and include searches of luggage. *Id.*; *Irving*, 452 F.3d at 123–24 ("[W]e have long ruled that searches of a person's luggage or personal belongings are routine searches.").

Here, Defendant was stopped by CBP Officers Raio, Baldwin, and Bunch at approximately 7:20 a.m. (Tr. 40:10–15), after he had arrived at JFK on a flight from Sao Paulo (Tr. 38:18–20), passed through primary immigration processing at approximately 6:30 a.m. (Tr. 39:14–18), collected his luggage at the baggage carousel (Tr. 14:11–16, 50:10–15), and was waiting in the Delta re-check line to check his bags for the next leg of his travels (Tr. 13:14–14:10). Defendant had a connecting flight to Atlanta 12 hours later but did not want to carry his luggage all day. (Dkt. 24-1 (Newton Declaration), ¶¶ 5–6.) Defendant's ultimate destination was outside of the United States. (Tr. 60:1–3.) The re-check line where Defendant was stopped was approximately 100 feet outside of the federal inspection area, which is the area where passengers arriving from international travel, such as Defendant, are inspected for immigration purposes and processed through customs. (Tr. 13:14–14:2.) Only ticketed passengers who are connecting to another flight are permitted in the re-check area. (Tr. 14:3–7.) Upon approaching Defendant, Officer Raio asked for his passport and name, and if he would return with him to the federal inspection area. (Tr. 14:17–19.) Defendant agreed and started to walk away from the purple suitcase, but then, when Officer Raio asked him if it was his, he said that it was. (Tr. 14:20–15.) Officers Raio, Baldwin, and Bunch led Defendant to a private search room inside the federal inspection area where Defendant was questioned and his luggage was searched. (Tr. 15:3–17:6.)

Based on these facts, the Court concludes that Defendant's stop and search were conducted pursuant to the CBP's well-established authority to conduct a routine border search at an

5

international airport. Defendant argues that that the border search exception does not apply because at the point that Defendant was stopped by CBP officers—"approximately one hour after he had passed through primary inspection, *afte*r he had passed through customs and immigration and after he had retrieved his luggage"—he was no longer at the "functional equivalent" of the border. (Dkt. 46, at 4. (emphasis in original).) Defendant urges the Court to conclude that Defendant's search amounted to an "extended border search," which is usually "conducted after a person or some property has 'cleared an initial customs checkpoint and [has] entered the United States,'" *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986) (quoting dictum from *United States v. Glaziou,* 402 F.2d 8, 13 (2d Cir. 1968)), and must be "supported by reasonable suspicion" because of the "greater intrusion on legitimate expectations of privacy," *id.* (quoting *United States v. Niver,* 689 F.2d 520, 526 (5th Cir. 1982)). The Court does not agree that Defendant's stop and search amounted to an extended border search.[3]

---

[3] Indeed, the cases cited by the government support this conclusion. *See*, *e.g.*, *United States v. Ogueri*, 798 F.2d 452, 453 (11th Cir. 1986) (finding that search of the defendant, who was stopped at an airline counter "twenty yards beyond the customs enclosure, was valid as a search at the functional equivalent of the border" because the defendant "had not been assimilated into the mainstream of domestic activity" and "the contraband he was carrying had crossed the border"); *United States v. Ramos*, 645 F.2d 318, 320–21 (5th Cir. 1981) (finding that the defendant was subjected to a search at the functional equivalent of the border where he was stopped by customs officials 30 minutes after leaving the customs enclosure, after checking into the airport hotel located in the terminal complex, and it was reasonably certain that the cocaine found on the defendant had crossed the border). The cases cited by Defendant do not compel a different result. *See Gaviria*, 805 F.2d at 1111–14 (rejecting extended border search argument and finding that goods were searched at the functional equivalent of the border where they entered Miami from a foreign port with the ultimate destination of JFK, traveled under customs bond 1,500 miles over the course of eight days, and were subjected to a final customs inspection at JFK); *United States v. Bareno-Burgos*, 739 F. Supp. 772, 777–80 (E.D.N.Y. 1990) (rejecting extended border search argument and finding that baggage was searched at the functional equivalent of the border where the baggage had been checked through to a foreign destination, and was waiting to be loaded on a domestic flight from which the foreign connection would be made).

The concept of the "border" is "elastic" and "its precise limits depend on the facts of each case." *United States v. Saint Prix*, 672 F.2d 1077, 1083 (2d Cir. 1982). In addition, "[t]he border space of an airport includes 'a reasonable extended geographic area in the immediate vicinity of any entry point.'" *Irving*, 452 F.3d at 124. Defendant was stopped by CBP officers while standing in a re-check line that was only 100 feet from the federal inspection area and accessible only to ticketed passengers connecting to other flights. The stop occurred after Defendant had disembarked from an international flight, while still in the ticketed passenger re-check area of JFK airport, on his way to an international final destination, and not long after he was processed through customs and immigration. Under these facts, the concept of the border need not be stretched much, if at all, to conclude that that CBP's stop and search of Defendant and his luggage did not contravene Defendant's Fourth Amendment rights. Rather, the stop and search fell squarely within the routine border search exception to the Fourth Amendment that allows for warrantless and suspicionless stops and searches.

## II.   Defendant's Statements to Law Enforcement Should Not be Suppressed

Next, the Court concludes that Defendant's statements to law enforcement should not be suppressed because his pre-*Miranda* statements to CBP were not made while he was in custodial interrogation, and his post-*Miranda* statements were not elicited through a deliberate two-step interrogation aimed at circumventing *Miranda*.

"*Miranda*'s prophylactic warnings" are generally triggered by a "custodial interrogation of the defendant," meaning that the defendant is subjected to "express questioning or its functional equivalent" while in "custody." *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). The test for when a defendant is in "custody" "is objective . . . [and] depends on how a *reasonable person* in the suspect's position would view the situation." *Id.* at 151. The suspect's position is assessed based on consideration of "the circumstances surrounding the encounter with authorities,"

7

which include, among other things, "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion," and "especially . . . in border situations, the nature of the questions asked." *Id.* at 153. When arriving to an airport, where "compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation" and where "the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border," it follows that "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." *Id.* at 153–54. The expectation that "at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave [] reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest." *Id.* at 154.

"[T]he test for when *Miranda* warnings are mandated is *objective* with respect to the personal attitudes and *knowledge* of both the questioner and the person questioned." *Id.* at 151 (emphasis added). As an initial matter, the Court is not persuaded by Defendant's argument that he was subjected to a "custodial interrogation" by CBP officers because Officer Raio stopped Defendant based on Defendant matching certain criteria for Operation Cocoon and because Officer Raio already knew Defendant's name, flight information, and had a photograph of him at the time of the stop. These facts do not alter the *objective* circumstances surrounding Defendant's encounter with CBP, so as to support the conclusion that Defendant was in "custody" at the time he was questioned by CBP. In fact, even if such subjective considerations were relevant, Officer

8

Raio testified that he had very little knowledge of Operation Cocoon other than the direction from his deputy chief that Defendant was to be stopped and his bags searched. (Tr. 43:13–44:8.)

Based on the evidence adduced at the evidentiary hearing, the Court finds that the following facts were established by at least a preponderance of the evidence. While waiting to re-check bags at an international airport, Defendant was approached by three plainclothes CBP officers who possessed but did not display their weapons. (Tr. 13:5–20.) Defendant agreed to return to the federal inspection area with the officers. (Tr. 14:17–23.) Officer Raio described the tone of the initial meeting with Defendant as "cordial, friendly, [and] cooperative." (Tr. 15:1–2.) Defendant was taken—without any restraints—to a private search room approximately 500 feet inside the federal inspection area. (Tr. 15:5–22.) Initially, CBP Officer Lopez, who was in plainclothes, and CBP Officer Schaefer, who was in uniform, entered the private room with Defendant and shut the door. (Tr. 15:23–16:2, 18:12–15.) After approximately two minutes, Officer Raio opened the door and entered the private search room; thereafter, the door to the search room remained open. (Tr. 16:3–4, 30:20–32:3, 34:24.) At times, other CBP officers stood in or lingered near the open doorway. Although Officer Raio did not have personal knowledge of what happened in the room during the two minutes the door was shut, he explained that he has previously closed the door to a private search room if he was going to perform a pat-down, in order to provide privacy for the subject. (Tr. 54:14–23, 63:15–23.)

Upon entering the search room, Officer Raio asked Defendant basic travel questions, including where he traveled to, if he visited anyone while traveling, how long he was traveling for, who paid for his ticket and accommodations, and where he stayed. (Tr. 16:5–11.) Officer Raio estimated that his questioning of Defendant lasted approximately five minutes. (Tr. 33:17–21.) Officer Lopez searched Defendant's bags and asked Defendant "declaration questions," such as

9

whether the bags were his, whether the items in the bags were his, and whether he was aware of what was in the bags. (Tr. 16:15–17:6.) Officer Raio recalled that Defendant responded by providing the dates of his travel, explaining that someone else paid for his ticket and accommodations, that he had a connecting flight to a destination outside of the United States, and that he was given the purple suitcase by someone and was supposed to carry it with him. (Tr. 19:7–22.) Although Officer Raio stepped in and out of the private search room (Tr. 25:14–18), to his knowledge, aside from the limited "declaration questions" asked by Officer Lopez, Officer Raio was the only CBP officer to question Defendant. (Tr. 16:12–17:10, 17:23–25.) This was consistent with a CBP policy on which all officers are regularly trained, which dictates that the officer who makes the initial stop, here Officer Raio, is solely responsible for questioning the traveler. (Tr. 17:11–22, 24:19–25:1.) Also consistent with CBP protocol, Defendant was not provided *Miranda* warnings in advance of CBP questioning. (Tr. 19:2–6.) During this questioning, Defendant was not restrained and was not wearing handcuffs. (Tr. 18:22–19:1.) Although Officer Schaefer's firearm was visible because it was part of his uniform, no other firearms were displayed by anyone in the private search room. (Tr. 22:11–20.) Officer Raio explained that the tone of the interview with Defendant "didn't really change from the beginning. Everything was cordial, respectful, [and] cooperative." (Tr. 22:7–10.)

Given the totality of the circumstances of Defendant's encounter with CBP officers, the Court does not find that a reasonable person in Defendant's position would have viewed themselves to be in "custody" up until this point in the interaction. While certain facts suggest that Defendant was in "custody" during the interview—including that the interview took place in a private room out of public view, that the door was briefly closed, that CBP officers hovered near the doorway when the door was open, and that some uniformed CBP officers had visible weapons

10

as part of their uniform—other facts contradict such a finding. Defendant agreed to go with CBP officers into the federal inspection area, no weapons were ever drawn or displayed to Defendant, he was escorted to the private inspection room without restraint and remained unrestrained until the time of his arrest, the tone of the encounter was calm and cordial, and the questioning by Officer Raio regarding Defendant's travel and by Officer Lopez regarding Defendant's bags lasted only a few minutes and was generally consistent with what a reasonable person would expect to be asked upon entering the United States from abroad. That Defendant claims he was told by unidentified agents that he was "a mule" and asked by unidentified agents "[w]hy all the high dollar suits and ties" (Dkt. 42-1 (Newton Declaration), ¶¶ 11–12), neither of which were corroborated at the evidentiary hearing, does not alter the Court's assessment of CBP's questioning as generally relevant to Defendant's international arrival to the United States. For these reasons, the Court finds that the statements made by Defendant to CBP officers prior to his arrest were not made while he was in "custody" and thus *Miranda* warnings were not required.

It was only after CBP officers determined that the white powdery substance found in the purple suitcase was cocaine that Defendant was placed under arrest and handcuffed. (Tr. 22:21–23:16.) Officer Raio stopped questioning Defendant after he was placed in handcuffs. (Tr. 64:3–5.) This is consistent with CBP training that once something has been found "and the person is going to be placed under arrest, all questioning stops." (Tr. 25:2–5.) Although Officer Raio stopped questioning Defendant, Defendant continued to make statements. (Tr. 23:20–24:7.) The CBP officers turned their attention to completing paperwork and processing the narcotics, which can take several hours to complete. (Tr. 11:9–12, 23:8–11.) CBP also contacted HSI approximately 30 minutes after Defendant's arrest. (Tr. 23:8–16, 57:9–22.)

11

In reaching the conclusion that Defendant was subjected to routine non-custodial questioning at the border, the Court joins other courts in the Second Circuit that have reached the same conclusion under similar circumstances. *See FNU LNU*, 653 F.3d at 155 (finding that the defendant was not in "custody" where, on the one hand, the defendant's interrogation occurred "in a closed room, out of public view; armed guards escorted the defendant there and remained in the vicinity; [the interrogation] lasted for 90 minutes, . . . the defendant's finger prints [were taken]" and she was not informed that she was free to go; but on the other hand, "the officers never drew their weapons; no physical restraints were used; and, crucially, a reasonable person would recognize all [of the CBP officer's] questions as relevant to her admissibility to the United States"); *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (summary order) (finding that the defendant was not "in custody" where a CBP officer discovered a white powdery substance in the defendant's bag during an initial examination in an open area just beyond the customs checkpoint, the CBP officer "escorted [the defendant], without placing her in handcuffs, to a more private part of the airport, where he field-tested the substance," and then formally arrested the defendant "[f]our minutes after [the defendant] was placed in the private search room"); *United States v. Hassan*, No. 18-CR-603 (ARR), 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019) (denying motion to suppress pre-arrest statements where "CBP officers took [the defendant to] a separate room, questioned him about his travels, searched his luggage, copied his paperwork, took his cell phone, and would not allow him to be alone" because these amounted to "routine restraints at a border crossing, and would not make a reasonable person feel that he was under arrest"); *United States v. Tavares*, No. 11-CR-610 (NGG), 2012 WL 194974, at *1–*2 (E.D.N.Y. Jan. 23, 2012) (finding that the defendant was not "in custody," but subject to "nothing more than the conditions typical of a modern border inspection" where "[a] uniformed agent escorted [the

defendant] to a separate inspection area [and] where a uniformed CBP officer interrogated [the defendant] without first reading him his *Miranda* rights").

Additionally, the Court finds that any statements Defendant may have made *after* his arrest also did not trigger *Miranda*'s prophylactic warnings because they were not elicited in response to "express questioning or its functional equivalent," such as conduct "likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner." *United States v. Broughton*, 983 F. Supp. 2d 224, 230 (E.D.N.Y. 2013) (quoting *United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004)), *aff'd,* 600 F. App'x 780 (2d Cir. 2015). Officer Raio testified that the questioning of Defendant ceased after Defendant was in handcuffs, and there is no evidence that statements made by Defendant after his arrest were in response to questions by CBP officers or were anything other than voluntary. "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). After Defendant was arrested, CBP officers began processing the narcotics and completing CBP paperwork (Tr. 23:8–24:18, 55:17–21), neither of which is the type of activity likely to elicit an incriminating response. *See Broughton*, 983 F. Supp. 2d at 232 ("[The CBP officer] merely continued a process of examining [the defendant's] bag for contraband [in the defendant's presence]. This ongoing search is not the type of activity that was 'likely to elicit an incriminating response.'" (quoting *Rodriguez*, 356 F.3d at 258)). For these reasons, Defendant's pre-*Miranda* statements to CBP were not made under circumstances that violated Defendant's Fifth Amendment rights and should not be suppressed.

Defendant's post-*Miranda* statements also should not be suppressed. Defendant argues that his post-*Miranda* statements are inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004), in which "a divided Court refused to allow [a] postwarning confession where a 'two-step

13

interrogation technique was used in a calculated way to undermine the *Miranda* warning.'" *United States v. Carter*, 489 F.3d 528, 535 (2d Cir. 2007) (quoting *Seibert*, 542 U.S. at 622).[4] To start, the analysis asks whether "the initial statement" by the defendant during the first stage of the interrogation, "though voluntary, [was] obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further." *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012). For the reasons already explained, the Court has determined that Defendant's statements to CBP were not made in the context of a custodial interrogation, and therefore were not obtained in violation of his *Miranda* rights. Thus, it is not clear that *Seibert* is applicable as a basis for suppressing Defendant's post-*Miranda* statements to HSI. *See United States v. Medina*, 19 F. Supp. 3d 518, 542 (S.D.N.Y. 2014) (finding that certain questioning by police did not constitute a "first stage" interrogation under *Seibert* because the defendant was not "in custody" at the time).

But even assuming that Defendant's initial statements to CBP were obtained in violation of his *Miranda* rights, the government has nonetheless "demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine [Defendant's] *Miranda* rights." *Moore*, 670 F.3d at 230. In assessing deliberateness, courts will "review the totality of the objective and subjective evidence surrounding the interrogations," and will be "guided by—but not limited to—

---

[4] In *Missouri v. Seibert*, the defendant was awakened at 3:00 a.m., arrested, taken to the police station, left alone in an interview room for 15 to 20 minutes, then questioned without *Miranda* warnings for 30 to 40 minutes by a police officer who squeezed her arm and kept repeating the same statement regarding the defendant allegedly knowing of the crime until the defendant confessed. 542 U.S. at 604–05. Then, after the defendant was given a 20-minute cigarette break, the *same* police officer turned on a tape recorder, gave the defendant *Miranda* warnings, obtained a signed waiver of rights, resumed questioning with "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" and confronted the defendant with her prewarning statements. *Id.* at 605. After she was charged with first-degree murder, the defendant sought to exclude both her prewarning and postwarning statements. *Id.*

14

the factors identified by the plurality in *Seibert*." *United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) (citations omitted). These factors include,

> (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and second" interrogations, (4) "the continuity of police personnel" doing the questioning, and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."

*Id.* at 228 (quoting *Seibert*, 542 U.S. at 615); *accord Carter*, 489 F.3d at 535. The evidence adduced at the evidentiary hearing demonstrates that all five factors weigh in favor of the government.

As to the first factor, Officer Raio asked Defendant approximately *five minutes* worth of limited questions about his travel and Officer Lopez asked Defendant brief, limited "declaration questions" about his bags and their contents. (Tr. 16:5–17:6, 33:17–21.) Defendant responded to these questions by providing the dates of his travel, explaining that someone else paid for his ticket and accommodations, that he had a connecting flight to a destination outside of the United States, and that he was given the purple suitcase by someone and was supposed to carry it with him. (Tr. 19:7–22.) The evidence demonstrates that CBP's questioning was far from "systematic, exhaustive, and managed with psychological skill," such that "little, if anything, of incriminating potential [was] left unsaid." *United States v. Williams*, 681 F.3d 35, 44 (2d Cir. 2012) (quoting *Seibert*, 542 U.S. at 616). Rather, CBP's questioning was relatively "brief and spare," and focused on travel and declaration questions relevant to Defendant's arrival in the United States. *Id.* (quoting *Moore*, 670 F.3d at 231). As to the second factor, after Agent Shipley provided Defendant with a *Miranda* warning and obtained a signed Statement of Rights form (Tr. 79:13–15, 79:22–80:4, 80:18–20), he interviewed Defendant for approximately *50 minutes* and covered topics ranging from Defendant's prior travels to Brazil and Hong Kong; the purpose of his recent trip to

15

Brazil; his history of business, communications, and other dealings with individuals in Brazil, Hong Kong, and Korea; his finances; and his electronic devices. (*See generally* Dkt. 32-2 (video and audio recordings of HSI interview).) During this interview, Defendant spoke extensively and extemporaneously, with Agent Shipley interrupting only occasionally with follow-up questions to collect additional information. (*See generally id.*; Tr. 98:25–99:10.) While there was overlap between CBP's and HSI's interviews regarding Defendant's travel on that date and his bags, the overlap was minimal in length and subject matter when compared to the lengthy, detailed statements Defendant made on a wide range of topics during the 50-minute interview with HSI. *See Williams*, 681 F.3d at 44 (finding that statements did not "appreciably overlap" where the defendant's "sole statement at the apartment tied him to ownership of four guns," but "[b]y contrast, his full confession at the station house explained in detail the history, operation, and profit-sharing arrangements of his conspiracy [], and elaborated significantly on his earlier statement"). Thus, the first and second factors do not support a finding that CBP officers and HSI agents were engaged in a deliberate strategy to circumvent *Miranda*.

The third and fourth factors also do not support such a finding. CBP questioned Defendant for approximately five minutes shortly after 7:20 a.m. (Tr. 33:17–21, 40:10–15), while Agent Shipley began questioning Defendant nearly four hours later, just before 11:30 a.m. (Tr. 83:16–22). CBP questioned Defendant in a private search room in the federal inspection area (Tr. 15:3–12), while Agent Shipley interviewed Defendant in the HSI office, which was on a different floor from the private search room, approximately a 10-minute walk away (Tr. 77:4–20). No HSI agents were present when Defendant was questioned by CBP. (Tr. 20:17–19, 76:16–18.) No CBP officers were present when Defendant was questioned by HSI. (Tr. 77:21–78:1.) Given the distance in time and location between the questioning by CBP and HSI, as well as the absence of

16

any continuity in personnel doing, or present during, the questioning at these separate stages, the Court finds that the third and fourth factors do not support a finding that CBP officers and HSI agents were engaged in a deliberate strategy to circumvent *Miranda*.

Finally, the fifth factor, "the degree to which the interrogator's questions treated the second round as continuous with the first," also weighs against such a finding. Agent Shipley testified that around 8:16 a.m. on February 16, 2020, he received a duty line call, informing him of Defendant's name, flight information, and that Defendant was being detained after CBP found narcotics. (Tr. 86:11–87:8.) As the case agent on Defendant's case, it was Agent Shipley's role to lead the investigation. (Tr. 71:15–23.) However, at no point did Agent Shipley direct CBP to question Defendant, request CBP to ask certain questions of Defendant, nor give any direction to CBP about providing *Miranda* warnings to Defendant. (Tr. 73:2–13.) Before interviewing Defendant, Agent Shipley spoke with Officer Lopez, who was the point of contact for the seizure, but could not recall having conversations with Officer Raio or other CBP officers. (Tr. 96:6–24.) CBP informed Agent Shipley of Defendant's basic biographical information, including his name and date of birth; his flight number and itinerary; that narcotics were seized from a bag; that Defendant had taken a previous trip with a similar itinerary; and that Defendant worked for a company called RCC Holdings based on documents and a business card seized during the search. (Tr. 73:16–74:12.) Agent Shipley also learned from Officer Lopez that Defendant had made two statements to CBP once the narcotics were discovered—first, Defendant said something along the lines of it didn't take a rocket scientist to figure out what was in the luggage, and second, Defendant said that the bag and its contents "no longer" belonged to him, even though he had previously claimed ownership. (Tr. 74:13–75:3, 97:18–98:4.) In addition, CBP provided Agent Shipley with three electronic devices obtained from Defendant, two iPhones and one iPad. (Tr. 75:17–25.)

17

However, Agent Shipley was not provided with the passcodes to the devices, information about the content of the devices, nor any electronic media reports for the devices, which are typically prepared by CBP if they take custody of or examine electronic devices.  (Tr. 76:1–15.)  Indeed, Officer Raio testified that no electronic media report was completed because he did not ask Defendant about the contents of, nor request the passcodes for, the devices.  (Tr. 20:20–21:3, 21:17–22:6.)

During the evidentiary hearing, Agent Shipley testified that he recalled only using one piece of information provided by CBP during his interview of Defendant—the information about Defendant's previous travel itinerary from Sao Paulo to Hong Kong.  (Tr. 98:9–19.)  Beyond that, Agent Shipley explained that he did not really have use for the information provided by CBP because Defendant talked about a lot of other topics.  (Tr. 99:20–24.)  Agent Shipley did not ask Defendant about his two prior statements to CBP.  Thus, "nothing in the record suggests that the latter session [of questioning by Agent Shipley] was essentially a cross-examination using information gained during the first round of [questioning by CBP]."  *See Williams*, 681 F.3d at 45.  Based on these facts, the Court finds that the evidence does not support a finding that Agent Shipley's questions treated the HSI interview as continuous with CBP's questioning of Defendant.[5]

In sum, based on a review of the totality of the objective and subjective evidence surrounding Defendant's questioning by CBP and interview by HSI, including a consideration of

---

[5] The Court notes that Officer Raio testified that his supervisor told him that based on Defendant matching some of the Operation Cocoon criteria, "they" wanted Defendant to be stopped and his luggage searched, and that Officer Raio did not know who "they" was. (Tr. 43:23–44:8.)  The evidence indicates that Operation Cocoon was a CBP operation and there is nothing in the record to suggest that either HSI was involved in that operation or directed CBP to stop Defendant that day.  (Tr. 43:8–44:8.)  In fact, Officer Raio testified that Operation Cocoon was run by "Port," meaning "Port JFK, so U.S. Customs and Border Protection" (Tr. 50:1–8), and Agent Shipley testified that he only learned about Operation Cocoon "after the fact, following this case," and that as far as he knew it was "mainly a CBP directive" (Tr. 106:12–19).

the factors identified in *Seibert*, the Court finds that Defendant's post-*Miranda* statements should not be suppressed because they were not elicited through a two-step interrogation technique calculated to undermine *Miranda*.

## CONCLUSION

In conclusion, the evidence adduced at the evidentiary hearing demonstrates that Defendant was subjected to a routine stop and border search by CBP that did not violate his Fourth Amendment rights to be free from unreasonable search and seizure; CBP's questioning of Defendant did not constitute a custodial interrogation sufficient to trigger *Miranda*'s prophylactic warnings; and CBP and HSI did not engage in a deliberate two-step process calculated to undermine Defendant's *Miranda* rights in contravention of the Fifth Amendment. Accordingly, Defendant's motion to suppress his pre- and post-*Miranda* statements as well as all physical evidence is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 8, 2021
      Brooklyn, New York

19